# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYREL ATCHLEY; SCARLETT "TARA" ATCHLEY; and MAGNASSUN ATCHLEY, a minor by and through his guardian Ad Litem, Mesa Atchley,<br><br>Plaintiffs,<br><br>vs.<br><br>LA MESA POLICE OFFICER SEAN SNOW; LA MESA POLICE OFFICER RODOLFO SALAZAR; CITY OF LA MESA; COUNTY OF SAN DIEGO; and MARIA LUISA CORIA,<br><br>Defendants. | CASE NO. 11cv1516 JM(WMc)<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS; DENYING LEAVE TO AMEND |

    Pursuant to Fed.R.Civ.P. 12(b)(6), Defendant Maria Luisa Coria ("Coria") moves to dismiss the civil rights complaint for failure to state a claim. Defendant Officers Sean Snow ("Snow") and Rodolfo Salazar ("Salazar") separately move to dismiss the complaint. Plaintiffs Tyrel Atchley ("Atchley"), Scarlett "Tara" Atchley ("Tara"), and Magnassun Atchley ("M.A.") oppose all motions. Pursuant to Local Rule 7.1(d)(1), the matters presented are appropriate for decision without oral argument. For the reasons set forth below, the court grants in part and denies in part the motions to dismiss. The court also denies the request for leave to amend without prejudice.

/ / /

/ / /

**BACKGROUND**

On July 8, 2011, Plaintiffs commenced this civil rights action against County of San Diego; Coria, a social worker with the Health and Human Services Division of County; City of La Mesa; and La Mesa police officers Snow and Salazar. (Ct. Dkt. 1). On May 1, 2012, Plaintiffs filed the First Amended Complaint ("FAC") alleging eight causes for: (1) interference with parental rights in violation of 42 U.S.C. §1983; (2) interference with the child's fundamental right to be with parents in violation of 42 U.S.C. §1983; (3) intentional infliction of emotional distress; (4) battery; (5) assault; (6) negligence; (7) violation of Cal. Civil Code §43; and (8) violation of Cal. Civil Code §52.1.

Plaintiffs' claims arise from a series of events commencing on the night of July 9, 2010.[1] On that date, Atchley asked a neighbor to watch his sleeping son while he went to the grocery store. While absent from the apartment, another neighbor, Leesha Chapman, a.k.a. Stormy, allegedly entered the apartment and took some of Tara's belongings, including jewelry. (FAC ¶20). Once Atchley returned to the apartment, he received a telephone call from Stormy demanding that she be paid for the return of the property. Atchley went to Stormy's apartment - she lived in the same complex - and a confrontation ensued with Stormy and two men who were at the apartment. After a brief struggle, Atchley then fled the apartment leaving behind his cell phone, hat and some keys. (FAC ¶22). Atchley then called 911 and Officers Show and Salazar responded to the call. (FAC ¶23).

Atchley, who was in his car when the officers arrived, got out of the car and explained what happened. The officers then asked why he called the police. The officers then allegedly mocked and laughed at him. (FAC ¶24). Atchley got back in his car and went to the apartment complex.

Meanwhile, Tara, who was on deployment with the U.S. Navy in the middle of the Pacific Ocean, happened to call Atchley's cell phone from the Navy ship. Stormy answered the cell phone that Atchley had left behind at her apartment. Stormy called Tara names and said that Atchley stole "dope" from her. (FAC ¶26). At 10:11 p.m. Tara called the La Mesa Police Department. Officer Snow went to the apartment and called Tara informing her that the apartment was in disarray and smelled like marijuana. (FAC ¶ 27). Tara then allegedly informed the officers that she desired to file

---

[1] As with the original complaint, the court notes that the FAC pleads extensive evidentiary facts not required by federal notice pleading rules. See Fed.R.Civ.P. 8(a).

a missing child report. At around 5:00 the next day, Child Protective Services ("CPS") left a message for Tara that M.A. was in the custody of CPS. (FAC ¶28).

After the initial contact with Officers Snow and Salazar, Atchley drove to the apartment of LaVonne where he had left M.A. (FAC ¶31). Shortly thereafter, Officers Snow and Salazar, along with about five additional officers, arrived at LaVonne's apartment and asked Atchley to step outside. After speaking with the officers, the officers left the area. About 30-45 minutes later, Atchley left LaVonne's apartment and headed to a hotel. While in route, he received a call from a neighbor who informed him that the police were there and requested that Atchley and M.A. return to the apartment complex. (FAC ¶¶33-34).

Atchley arrived back at his apartment carrying M.A. The officers allegedly ordered Atchley to put M.A. down and to place his hands behind his back. (FAC ¶35). Atchley did not want to comply because M.A. was asleep and the ground was wet. Atchley then handed M.A. over to Officer Salazar. Officer Snow then rushed Atchley and threw him to the ground. Officer Snow then had Atchley sit on a step and informed him that they were "taking [his] son tonight because [Atchley] was not fit to care for [his] son." (FAC ¶37). Atchley became upset at losing his son. Officer Salazar then allegedly placed his hand on M.A. and said, "You hear that, that's your daddy [and he] is a fu**ing loser." (FAC ¶39).

The officers allegedly told Atchley that both his mother, Mesa Atchley ( Mesa"), and Tara had requested that they take custody of M.A. and leave Atchley in the apartment alone. After the officers left, Atchley called his mother, Mesa, and was informed that she had never requested that M.A. be taken from him. (Compl. ¶44). At about 2:00 a.m. on July 10, 2010, the officers took custody of M.A. and transported him to the Polinsky Children's Center. (FAC ¶41).

On July 10, 2011, without introducing herself, Coria appeared at Plaintiffs' apartment and did a walk through. (FAC ¶42). Coria did not respond when Atchley asked her where M.A. was located. On the same day, Mesa flew to San Diego and went to the Polinsky Children's Center to meet with Defendant Coria. Coria did not return M.A. that day and continued to ask Atchley, Mesa and Gilpin, a companion, whether Atchley had any drug problems. (FAC ¶43). The next day, M.A. was not returned to Atchley, (Compl. ¶47), but to Mesa.

Later on July 10, 2011, at around 9:30 p.m., Atchley went to his apartment to retrieve some personal belongings. Gilpin went to the apartment to pick up some clothes. Atchley waited in the car when an officer tapped on the window and ordered him out of the car. The police found some pills in his pocket and Atchley explained that they were prescription medications and that the prescriptions were in the glove compartment. Officer Atwood, the arresting officer, then arrested Atchley for two non-reduceable driving felonies and a reckless driving charge. Atchley spent five days in jail and was released on July 15, 2010. Ultimately, on July 23, 2010, Atchley brought his two medical prescriptions to court and, under the advice of his public defender, entered into a plea bargain and the two non-reduceable felonies were dismissed. He paid a fine of $827 and attended a Mothers Against Drunk Driving class. (FAC ¶¶44-49).

In the meantime, Tara received emergency leave and went to the Polinsky Children's Center where she and Mesa met with Coria's supervisor, Barbara Wright, to discuss a safety plan. Tara was informed by Ms. Wright that if she signed the safety plan, she could take M.A. home with her. (FAC ¶50). Tara agreed that Atchley would not assume custody of their son. The plan stated that Atchley associated with persons who are known as substance abusers and dealers and that there was "possible" substance abuse by Atchley. Even though she disagreed with the safety plan, Tara signed the document. On July 11, 2010, M.A. was reunited with his mother. (FAC ¶76).

The next morning, Tara and Mesa met with Coria. Defendant Coria allegedly told Tara and Mesa that she had video surveillance of Atchley stealing washers, dryers and rims off cars. (FAC ¶52). Tara denied any drug use by Atchley. Coria stated that M.A. was going to Washington State with Mesa, away from Atchley. Shortly thereafter, Mesa returned to Seattle with M.A.

Over the next several weeks, Atchley attempted to find out more information from the Department of Health and Human Services. On one occasion Coria told Atchley to stop "kidding himself and to admit that he was a drug addict. . ." She even told him to go into a six-month in-patient hard detoxification center. (FAC ¶55). On August 5, 2010 M.A. was reunited with Atchley and Tara. (FAC ¶57).

On August 20, 2011, Coria presented Tara and Atchley with a second safety plan. Coria represented that M.A. had been exposed to methamphetamine and amphetamines. Coria refused to

show Atchley and Tara the drug test results and also requested that they both take drug tests and represented that their refusal would result in a finding that M.A. was "in imminent danger and have him removed from [the] home." (FAC ¶61). Atchley and Tara signed the safety plan under "coercion and duress" and then submitted to drug testing. Even though no one disclosed the results of the drug tests to them, they believe the tests were negative. Id. On November 1, 2011, Tara and Atchley learned that M.A. had negative drug tests and that Coria had "lied" about the positive drug test results. (FAC ¶64).

In September 2011, Coria informed Tara and Atchley that the case had been "promoted to voluntary contract." (FAC ¶65). They refused to sign the contract because of the references to drug use and drug counseling. On October 14, 2010, and with M.A. still living with Mesa in Washington State, the case was closed. (FAC ¶67).

Plaintiffs allege that Atchley had recorded conversations "as proof of Coria and County's lies." (FAC ¶69). However, on November 9, 2010 his apartment was burglarized and the recorded conversations were stolen along with a video camera, laptop, and flash drives. Both Tara and Atchley allegedly have suffered extreme emotional distress because of the alleged events. (FAC ¶¶70-76).

Based upon the above generally described conduct, Defendant Coria and Defendants Snow and Salazar move to dismiss all claims.

**DISCUSSION**

**Legal Standards**

General Pleading Standards

Federal Rule of Civil Procedure 12(b)(6) dismissal is proper only in "extraordinary" cases. United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981). Courts should grant 12(b)(6) relief only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990). Courts should dismiss a complaint for failure to state a claim when the factual allegations are insufficient "to raise a right to relief above the speculative level." Bell Atlantic Corp v. Twombly, 550 U.S. 544, 555 (2007) (the complaint's allegations must "plausibly suggest[]" that the pleader is entitled to relief); Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009) (under Rule 8(a), well-pleaded facts must do more than

permit the court to infer the mere possibility of misconduct). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u> at 1949.  Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u>  The defect must appear on the face of the complaint itself.  Thus, courts may not consider extraneous material in testing its legal adequacy. <u>Levine v. Diamanthuset, Inc.</u>, 950 F.2d 1478, 1482 (9th Cir. 1991).  The courts may, however, consider material properly submitted as part of the complaint. <u>Hal Roach Studios, Inc. v. Richard Feiner and Co.</u>, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989).

Finally, courts must construe the complaint in the light most favorable to the plaintiff. <u>Concha v. London</u>, 62 F.3d 1493, 1500 (9th Cir. 1995), <u>cert. dismissed</u>, 116 S. Ct. 1710 (1996).  Accordingly, courts must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. <u>Holden v. Hagopian</u>, 978 F.2d 1115, 1118 (9th Cir. 1992).  However, conclusory allegations of law and unwarranted inferences are insufficient to defeat a Rule 12(b)(6) motion. <u>In Re Syntex Corp. Sec. Litig.</u>, 95 F.3d 922, 926 (9th Cir. 1996).

<u>Pleading Civil Rights Claims</u>

Prior to <u>Iqbal</u> and <u>Twombly</u>, "a claim of municipal liability under § 1983 is sufficient to withstand a motion to dismiss even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice." <u>Whitaker v. Garcetti</u>, 486 F.3d 572, 581 (9th Cir.2007). In addressing the impact of <u>Iqbal</u> and <u>Twombly</u> on the pleading standards for civil rights cases, the Ninth Circuit recently stated:

> we can at least state the following two principles common to all of them. First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

<u>AE ex rel. Hernandez v. County of Tulare</u>, 666 F.3d 631,637 (9th Cir. 2012) (quoting <u>Starr v. Baca</u>, 652 F.3d 1202 (9th Cir.2011)).

/ / /

/ / /

**Coria's Motion**

<u>The Civil Rights Claims</u>

The FAC sets forth two different, but related, series of events. The first relates to the initial removal of M.A. from Atchley's care on July 10, 2010 and the second to events occurring after M.A. was transferred to the Polinsky Children's Center.

### The Initial Removal of M.A.

In broad brush, Plaintiffs allege that Coria is liable under §1983 for the initial removal of M.A. because Coria conspired with Snow and Salazar. (FAC ¶84, 95). The court concludes that Plaintiffs fail to state a claim against Coria based upon the initial removal of M.A. The FAC's mere reference to a "conspiracy" between Defendants is insufficient to state a claim. Plaintiffs must allege "(1) the existence of an express or implied agreement among the defendant officers to deprive [Plaintiffs] of [their] constitutional rights and (2) an actual deprivation of those rights resulting from that agreement." <u>Ting v. United States</u>, 927 F.2d 1504, 1512 (9th Cir. 1991). Plaintiffs must set forth sufficient allegations to support a conspiracy between the Defendants. A bare allegation that Defendants "conspired," without more, does not state a claim for conspiracy to violate §1983.

In sum, to the extent Plaintiffs seek to impose liability on Coria under a conspiracy theory based upon actions allegedly taken by Snow and Salazar, the court grants the motion to dismiss this claim without prejudice.

### Events Occurring After the Initial Removal of M.A.

At the heart of Plaintiffs' interference claims is the allegation that Coria (1) unconstitutionally interfered with familial relations and (2) coerced them into agreeing to a safety plan. "[A] safety plan imposes certain restrictions pending completion of the state's investigation into suspected abuse." <u>Hernandez ex rel. Hernandez v. Foster</u>, 657 F.3d 463, 481 (7th Cir. 2011). The Seventh Circuit noted that it "is not a forbidden means of 'coercing' a settlement to threaten merely to enforce one's legal [authority]. However, it is improper to obtain consent to a safety plan through duress or other illegal means." <u>Id.</u> (citations omitted).

It is well-established that "parents and children have a well-elaborated constitutional right to live together without government interference." <u>Wallis v. Spencer</u>, 202 F.3d 1126, 1136 (9th Cir.

2000). As explained by the Ninth Circuit, parents have a "constitutionally protected right to the care and custody of [their] children and cannot be 'summarily deprived of that custody without notice and a hearing,' except where 'the children [are] in imminent danger.'" Mueller v. Auker,- - -F.3d —, 2012 WL 3892960 (9th Cir. 2012) (quoting Ram v. Rubin, 118 F.3d 1306, 1310 (9th Cir. 1997)). Due process prohibits the government from interfering in familial relationships unless the government adheres to requirements of procedural and substantive due process. Here, the court concludes that the FAC adequately states a claim for interference with Plaintiffs' parental rights. Plaintiffs allege that Coria made material misrepresentations concerning Atchley (i.e. he used illegal controlled substances (FAC ¶51), M.A. had tested positive for methamphetamine (FAC ¶61), and Coria had video evidence that Atchley was stealing (FAC ¶52)) and, as a condition to releasing M.A., Plaintiffs allege that Coria mandated that M.A. travel to Washington State to be "away from Atchley." (FAC ¶52)). While mere verbal threats are generally insufficient to state a civil rights claim, see Hopson v., Fredericksen, 961 F.2d 1374, 1378 (8th Cir. 1992), the complaint goes beyond mere verbal threats or the preparation of a safety plan containing references to Atchley's alleged substances abuse. The complaint adequately states that Coria interfered with constitutionally protected familial relations by conditioning M.A.'s release on his removal to Washington State and then by continuing to coerce the parents to admit to allegedly false representations to undermine the familial relationship while M.A. remained in Washington State.

In sum, the court denies Coria's motion to dismiss based upon events occurring after the initial removal of M.A. on July 10, 2010.

Compliance with California Tort Claims Act

Coria argues that the state law claims are barred on account of Plaintiffs' failure to comply with the six-month claims period of Gov't Code §911.2. The failure to comply with the claims filing requirements bars the plaintiff from bringing suit. Cal.Gov't Code §945.4; Williams v. Horvath, 16 Cal.3d 834, 82 (1976). Coria asserts that M.A. was released to his mother on July 11, 2010 and that Plaintiffs did not file a claim until April 13, 2011, after the expiration of the six-month claims filing period.

Plaintiffs, however, assert that the state law causes of action did not accrue until October 14,

2010, the date when M.A.'s case was closed.  In general, California courts have found that limitations periods do not commence to run until an on-going situation is stabilized.  See Stonewall Ins. Co. v. City of Palos Verdes Estates, 46 Cal.App.4th 1810 (1996).  Viewing the complaint's allegations in the best light for Plaintiffs, see Concha, 62 F.3d at 1500, the court finds that the state causes of action did not accrue until M.A.'s case was closed by the CPS on October 14, 2010.  Accordingly, the court denies this portion of Coria's motion.

### The Civil Code Section 52.1 Claim

Civil Code Section 52.1(a) provides that if a person interferes, or attempts to interfere, by threats, intimidation, or coercion, with the exercise or enjoyment of the constitutional or statutory rights of "any individual or individuals," the Attorney General, or any district or city attorney, may bring a civil action for equitable or injunctive relief.  Section 52.1(b) allows "[a]ny individual" so interfered with to sue for damages.  Plaintiffs Atchley and M.A. allege that County "actually interfered using threats, intimidation, and coercion, with the exercise all of individual rights secured by the United States Constitution."  (FAC ¶165).  In light of the allegation that Coria made material misrepresentations and threatened to retain custody of M.A. unless he was removed to Washington State, (FAC ¶¶53-54), the court concludes that Plaintiffs also state a Section 52.1 claim

In sum, court denies the motion to dismiss this claim against Coria.

### The Intentional Infliction of Emotional Distress, False Imprisonment, Negligence, Invasion of Privacy

In its April 16 Order, the court dismissed these state law claims to the extent based upon the initial investigation and up to the time M.A. was returned on July 11, 2010.  In the present motion, Coria largely reiterates that these claims are "premised on the conduct of the La Mesa Police for whom Coria is not vicariously liable." (Motion at p.10:13-14).

Here, there appears to be a disconnect with the parties' arguments.  While Coria argues that she cannot be held liable for events arising out of the initial removal of M.A., the court notes that Plaintiffs do not dispute this general proposition.  Rather, Plaintiffs argue that events occurring after July 11, 2010 give rise to their state causes of action.  The court does not analyze arguments not mutually addressed by the parties.  Accordingly, the court denies Coria's motion to the extent based on events occurring after July 11, 2011.

**The Motion of Snow and Salazar**

<u>The Civil Rights Claims</u>

At the outset the court notes that the parties raise difficult issues related to the welfare of minors and the rights of familial association. Defendants argue that they temporarily removed M.A. pursuant to Cal. Welfare & Inst. Code § 305. That section provides, in pertinent part:

> Any peace officer may, without a warrant, take into temporary custody a minor:
>
> (a) When the officer has reasonable cause for believing that the minor is a person described in Section 300, and, in addition, that the minor has an immediate need for medical care, or the minor is in immediate danger of physical or sexual abuse, or the physical environment or the fact that the child is left unattended poses an immediate threat to the child's health or safety.

Defendants further argue that they acted lawfully pursuant to W & I Code §300, which provides in pertinent part:

> Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:
>
> (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse.

W & I Code §300.

Defendants argue that they had "a reasonable basis to believe M.A. could suffer serious physical harm due to ongoing substance abuse at the apartment and the negligent failure of Tyrel to provide M.A. with adequate shelter." (Motion at p.6:14-16).[2]

In support of this argument, Defendants rely upon the FAC's allegations to show that Defendants conducted a reasonable investigation. The events at issue commenced around 9:40 p.m. when Atchley called 911 to report that personal property had been stolen from his apartment. (FAC ¶23). Officers Snow and Salazar responded to the call. When asked why he called the police, Atchley

---

[2] As set forth herein, the issue is not whether these Defendants had a "reasonable basis" to remove M.A. from Atchley's custody, but whether they had a compelling reason to do so.

responded, "why wouldn't I?" (FAC ¶24). "Confused and angry," Atchely left the scene. Id. Shortly thereafter, at about 10:10 p.m., Tara, on deployment in the Pacific Ocean, called the La Mesa Police Department and spoke with Officer Snow. (FAC ¶27). Tara informed Officer Snow of her conversation with Leesha, the alleged thief. Leesha allegedly informed Tara that her husband was a "drug scumbag" who was physically assaulted "because he stole 'dope' from her." (FAC ¶26). Officer Snow informed Tara that their apartment was in disarray and smelled like marijuana. Not knowing the whereabouts of M.A., Tara allegedly stated that she wanted to file a missing child report. (FAC ¶28).

A short time later, Atchley returned to the apartment complex and proceeded to the apartment of LaVonne where he had left M.A. Officers Snow and Salazar, accompanied by other police officers then spoke with Atchely and allegedly asked him "What the f*** are you doing?" and stated that if he continued "running his mouth" that he was "going to get into trouble." (FAC ¶32). About 45 minutes later, Atchley left with M.A. and a friend, Gilpin, to spend the night in a hotel. While en route to a hotel, Gilpin received a telephone call from his mother saying that the police wanted to speak with Atchely. (FAC ¶33).

Upon return to the apartment complex, at around 2:00 a.m., Atchley was informed by Officer Salazar that they were "taking his son tonight because [ATCHLEY] was not fit to care for [his] son." (FAC ¶37). Atchley was also informed that both his mother, Mesa, and Tara, had requested that they take M.A. "and leave ATCHLEY alone at the apartment complex." (FAC ¶40). Plaintiffs allege that neither Mesa nor Tara requested that M.A. be removed from Atchley's care. (FAC ¶40). At all material times, Plaintiffs deny any illegal substance abuse. (FAC ¶30).

Viewing the complaint's allegations in the best light for Plaintiffs, Concha, 62 F.3d at 1500, the court concludes that Plaintiffs state a claim for the wrongful removal of M.A. from the custody of Atchley. Parents and children have a well-established due process constitutional right to live together without governmental interference that "guarantee[s] that parents and children will not be separated by the state without due process of law except in an emergency." Wallis, 202 F.3d at 1136. Taking as true, at this juncture, the FAC's allegations, and interpreted in the best light for Plaintiffs, Atchley was not abusing illegal substances, the officers misrepresented that the mother and mother-in-law

1  requested that M.A. be removed from Atchley's care, and, moreover, imminent circumstances did not
2  warrant the removal of M.A. from the home. The complaint's allegations do not establish that an
3  emergency situation existed such that removal of M.A. was warranted under the circumstances.
4      Defendants also argue that the alleged conduct is not so shocking as to violate Plaintiffs'
5  Fourteenth Amendment due process right to associate. See Curnow v. Ridgecrest Police, 952 F.2d
6  321, 325 (9th Cir.1991) ( "The Ninth Circuit recognizes that a parent has a constitutionally protected
7  liberty interest under the Fourteenth Amendment in the companionship and society of his or her child
8  ...."). At the present pleading stage of the case, viewing the allegations in the best light for Plaintiffs,
9  the removal of a child from the parent's care without due process (i.e. compliance with Cal. Wel. and
10 Inst. Code §§313, 315, 319) or in the absence of an emergency situation, see
11 Wallis, 202 F.3d at 1136, is sufficiently shocking to state a due process claim.
12     In sum, the court denies the motion to dismiss this claim.
13     Qualified Immunity
14     Qualified immunity protects government officers "from liability for civil damages insofar as
15 their conduct does not violate clearly established statutory or constitutional rights of which a
16 reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine
17 whether an officer is entitled to qualified immunity, we ask, in the order we choose, (1) whether the
18 alleged misconduct violated a right and (2) whether the right was clearly established at the time of the
19 alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009). "For a constitutional right
20 to be clearly established, its contours must be sufficiently clear that
21 a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536
22 U.S. 730, 739 (2002) (internal quotation marks omitted).
23     Here, at the present pleading stage, the court concludes, viewing the complaint's allegations
24 in the best light for Plaintiffs, that it is well-established that a child cannot be removed from the
25 parent's custody absent due process or in an emergency situation. As the complaint's allegations do
26 not establish that an emergency situation existed, the court denies the motion and notes that this claim
27 is better addressed in the context of an evidentiary motion. Although it is preferable for the court to
28 definitively rule upon a question of qualified immunity at an early stage in the proceeding, where the

issue is fraught with material factual questions requiring resolution, an evidentiary motion or trial are the preferred options.

In sum, the court denies the motion to dismiss based on qualified immunity without prejudice, subject to a further showing.

### The Intentional Infliction of Emotional Distress Claim

Defendants contend that the complaint fails to allege cognizable outrageous conduct. To state a claim for intentional infliction of emotional distress, "behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." Newby v. Alto Riviera Apartments, 60 Cal.Appl3d 288, 297 (1976). Although a close call, the court concludes that the complaint states a claim for intentional infliction of emotional distress. The complaint alleges that M.A. was wrongfully removed from his father's custody while Defendant Salazar told M.A. "You hear that, that's your daddy" and your daddy is a f****** loser." (FAC ¶¶39, 110). M.A. allegedly suffered extreme distress when M.A. was in the arms of Defendant Salazar and crying and screaming for his "Daddy." (FAC ¶39). The complaint also alleges that Defendants made material misrepresentations concerning the request of Atchley's wife and mother-in-law to remove M.A. from his custody. Finally, the court notes that this claim is better addressed in the context of an evidentiary motion.

In sum, the court denies the motion to dismiss the intentional infliction of emotional distress claim.

### The Assault and Battery Claims

Defendants move to dismiss this claim on the ground that rubbing M.A.'s back, as alleged in the complaint, does not constitute assault and battery by a police officer. A police officer may use reasonable force in effectuating a detention. Edson v. City of Anaheim, 63 Cal.App.4th 1269, 1272 (1998). The consequences of applying common law assault and battery principles to the conduct of law enforcement personnel "can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."

1  Id. (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)). The allegations that Officer Salazar
2  rubbed M.A.'s back is not actionable conduct. Even under the common law view, as noted by
3  Plaintiffs, touching must be done with the intent to harm or offend. Judicial Council of Civil Jury
4  Instructions 1300.
5        Plaintiffs argue that they are entitled to the inference that "M.A. reasonably believed that he
6  would be continued to be touched in the same, if not more egregious manner." (Oppo. at p.17:25-26).
7  The court concludes that this not a reasonable inference under the detailed allegations set forth in the
8  complaint. In sum, the court dismisses this claim with prejudice.
9        <u>Leave to Amend</u>
10       Plaintiffs also seek leave to amend the complaint. The court denies this request without
11 prejudice as further discovery appears necessary to shed light on the contours of the dismissed claims.
12 Plaintiffs may seek leave to amend at any time prior to expiration of the deadlines to be set in the Case
13 Management Order.
14       In sum, the court grants Coria's motion to dismiss without prejudice the §1983 claim based
15 upon the initial removal of M.A. in the early morning hours of July 10, 2010 and denies the motion
16 to dismiss the remainder of the claims asserted against her. The court also grants Defendants Salazar
17 and Snow's motion to dismiss the assault and battery claims with prejudice and denies the motion to
18 dismiss the remainder of the claims asserted against them. The court also denies Plaintiffs' request
19 for leave to amend without prejudice.
20       **IT IS SO ORDERED.**
21 DATED: October 5, 2012
22                                                 _____
23                                                   Hon. Jeffrey T. Miller
                                                  United States District Judge
24 cc:       All parties
25
26
27
28